UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re: IPASS, INC. SECURITIES LITIGATION

This Document Relates to:

ALL ACTIONS

No. C 05-00228 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Dismiss**

    Plaintiffs, a consolidated class, brought this action against defendant iPass, Inc. and several of its top executives (the "individual defendants"; collectively with iPass, "defendants") for alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Now before the court is defendants' motion to dismiss plaintiffs' Consolidated Amended Complaint ("CAC"). Having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules on the motion as follows.

BACKGROUND[1]

    iPass provides "software-enabled connectivity services for mobile workers"; iPass's connectivity services permit employees to obtain secure access to their employers' internal computer networks from remote locations. CAC ¶ 2. iPass receives revenue, in part, by charging employers a usage fee based on the amount of their employees' use of the service. During the time period

1

relevant to this lawsuit—the first two calendar quarters of 2004—users connected to the iPass service by dialing an access number using a conventional modem, operating over a telephone line. iPass provided a variety of dial-up access numbers in any given geographic area, much like a conventional internet service provider.

The four individual defendants were executives of iPass during the relevant period. Kenneth Denman was Chairman of the Board and Chief Executive Officer. Id. ¶ 16. Donald McCauley was Vice President and Chief Financial Officer. Id. ¶ 17. Anurag Lal was Vice President of Business Development. Id. ¶ 18. Jon Russo was Vice President of Marketing. Id. ¶ 19.

During the first quarter of 2004, from January 1 to March 31, iPass experienced substantial growth in its revenue and user base: iPass added 74,000 new users and had an 8.5% increase in revenue over the previous quarter. Id. ¶¶ 6, 25. On April 22, 2004 iPass issued a press release and participated in a conference call discussing its first quarter results. On the conference call defendants Denman and McCauley spoke positively about the first quarter results and projected nearly identical revenue and user growth for the second quarter.

Following the April 22 press release, certain of the individual defendants sold part of their holdings of iPass stock. Defendant McCauley sold 54,000 shares from his holding of 575,000 shares and vested stock options, or 9.39%.[2] Defendant Lal sold 45,000 shares from his holding of 552,000 shares and vested stock options, or 8.15%. Defendant Russo sold 25,000 shares from his holding of 129,688 shares and vested stock options, or 19.28%. Defendant Denman sold no stock.

iPass did not fare as well as projected during the second quarter. It added only 7,000 new users and experienced a small reduction in revenue compared to the first quarter. When iPass announced its earnings shortfall on June 30, 2004, its stock dropped by 35%. The drop in stock price caused investors in iPass to lose substantial sums of money and prompted the instant lawsuit.

Defendants attributed the revenue shortfall to two principal causes. Id. ¶ 32. First, in order to lower costs defendants attempted to reduce the number of separate dial-up numbers that they maintained. Id. As part of the reduction, certain previously operable access numbers were discontinued. According to defendants, users who were accustomed to using the discontinued access numbers became frustrated and ceased attempting to access the iPass service, despite the fact

2

that alternate access numbers were available. Second, defendants claimed to have suffered lost business as a result of internet viruses, particularly the so-called "Sasser" internet worm.

Two core factual allegations underlie the claims in the instant lawsuit. First, plaintiffs claim that the dial-up number consolidation and the Sasser worm began to have substantial negative effects on defendants' revenue prior to the April 22 press release and conference call, in which defendants announced their projected second quarter results. Id. ¶¶ 26, 28. Second, according to plaintiffs, defendants were aware of the negative effects on revenue through use of a reporting tool which provided defendants with daily information about the revenue generated by users accessing the iPass service. Id.

Based on these two core factual allegations, plaintiffs identify two actionable misrepresentations in the April 22 press release and conference call. First, plaintiffs claim that defendants falsely represented that the first quarter results demonstrated "business momentum" (the "business momentum" statement), because defendants already knew that revenue and user growth had begun to decline. Second, plaintiffs claim that defendants falsely projected that second quarter revenues would be between 7.5% and 8% higher than first quarter revenues, and that GAAP earnings would be $0.08 per share. Id. ¶¶ 25–27 (the "earnings" statement). According to plaintiffs, defendants already knew based on data provided by the reporting tool that the projections were impossible to achieve.

Defendants now move to dismiss plaintiffs' complaint on the grounds that the alleged misrepresentations are "puffery," that they are protected by a statutory safe harbor, and that plaintiffs have not pled the requisite mental state with sufficient particularity.

LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "[o]rdinarily, a court may look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Under Rule 12(b)(6),

3

1  "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied. Lewis v. Telephone Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996) (citation omitted); see also Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") significantly altered pleading requirements in private securities litigation in order to eliminate meritless claims. In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999). The statute requires that a securities fraud complaint must plead both fraud and scienter. See 15 U.S.C. § 78u-4(b)(1)–(2). Plaintiffs must (1) identify each statement alleged to have been misleading, (2) state the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. See 15 U.S.C. § 78u-4(b)(1); In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002). Allegations are deemed to be held on information and belief, and thus subject to the particularity requirement, unless plaintiffs have personal knowledge of the facts. In re The Vantive Corp., 283 F.3d at 1085, n.3.

A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has defined the requisite state of mind for a historical statement as "deliberate recklessness, at minimum," and requires plaintiffs to plead "particular facts giving rise to a strong inference" of that mental state. See In re Silicon Graphics, Inc., 183 F.3d at 974. For a forward-looking statement, plaintiff is required to plead facts supporting a strong inference that defendants had "actual knowledge . . . that the statement was false or misleading." See In re The Vantive Corp. 283 F.3d at 1085. "When determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original).

4

DISCUSSION

To state a claim under section 10(b), plaintiffs must allege a material misrepresentation, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d 956, 964 (N.D. Cal. 2005) (Schwarzer, J.) (citing Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1631 (2005)). Defendants argue that plaintiffs' complaint fails to allege either a material misrepresentation or the requisite mental state with sufficient particularity.

I.  Material Misrepresentations

Defendants challenge the legal sufficiency of the two alleged misrepresentations on a number of grounds. First, defendants argue that the business momentum statement is "puffery" and thus not actionable as a matter of law. Second, defendants argue that the earnings statement was forward-looking and is thus protected by the safe harbor provision of the PSLRA. Under the terms of the safe harbor, according to defendants, plaintiffs' complaint is deficient in that plaintiffs have not sufficiently pled that the earnings statement was knowingly false when made, and because the press release and conference call, as well as iPass's SEC filings, contained cautionary statements describing specific risk factors which could affect the projections.

A.  Puffery

This court recently reviewed the Ninth Circuit standard for determining whether an optimistic statement is mere "puffery" or is sufficiently concrete to be actionable under the securities laws. See In re Cornerstone Propane Partners, L.P., 355 F. Supp. 2d 1069, 1087–88 (N.D. Cal. 2005) (Patel, J.). The court recapitulates that standard here.

"[V]ague, generalized, and unspecific assertions" of corporate optimism or statements of "mere puffing" cannot serve as actionable material misstatements of fact under federal securities laws. See Glen Holly Entm't, Inc. v. Tektronix. Inc., 352 F.3d 367, 379 (9th Cir. 2003); Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997); Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004). Typically, such statements consist of forward-looking or generalized statements of

5

optimism that are "not capable of objective verification," and "lack[] a standard against which a reasonable investor could expect them to be pegged." See Grossman, 120 F.3d at 1119; Bridgestone, 387 F.3d at 489. Statements that fall within the rule tend to use terms that are not measurable and not tethered to facts that "a reasonable person would deem important to a securities investment decision." Bridgestone, 387 F.3d at 489. Interpretation of the "mere puffery" rule has distinguished cases of "definitive positive projections" from statements projecting "excellent results," a "blowout winner" product, "significant sales gains," and "10% to 30% growth rate over the next several years." See Grossman, 120 F.3d at 1119.

In In re Cornerstone Propane Partners, this court found a number of the alleged misstatements to be puffery under the preceding legal standard. In particular, the court found that the defendants' claims of "industry leading growth," "measurable progress," and "continuing improvements" were too vague to qualify as actionable statements. Id. at 1087, In contrast, statements "tethered by more objective measures of performance," including statements describing growth in particular financial metrics, such as "cash flow," "EBITDA," and available credit, may have been actionable. Id. at 1088. This court ultimately did not decide whether the latter category of statements were adequate, but instead dismissed the complaint on other grounds. Id.

Under the preceding standard, the business momentum statement is puffery because it is not linked to any particular facet of defendants' business. The statement that iPass has "momentum" is a term that might apply to any aspect of iPass's operations—revenue, size of customer base, market recognition, number of employees, technological sophistication, level of security provided by the service, or some combination thereof. Indeed, in one of the passages quoted by plaintiffs, immediately following a "momentum" statement is the claim that "[w]e continue to believe our progress on the Wi-Fi from [sic: front] means that no one is better positioned than iPass Inc. to benefit from Wi-Fi as it becomes adopted on a widespread basis by Enterprises." CAC ¶ 27. The word "momentum" in this passage apparently has absolutely nothing to do with the financial projections which form the core of this lawsuit. In light of the vague sense in which "momentum" is

6

used in the April 22 press release and conference call, an investor could not reasonably rely on the representations of momentum in drawing specific conclusions about iPass's financial health.

To the extent that plaintiffs' complaint depends upon statements related to defendants' "momentum," defendants' motion to dismiss is granted.

### B. Safe Harbor

Turning now to the forward-looking revenue and earnings projections which comprise plaintiffs' second claimed actionable statement, defendants argue that they are insulated from liability under the PSLRA "safe harbor." Forward-looking statements, including statements of projected earnings, receive special protection under the PSLRA. See 15 U.S.C. § 78u-5(i)(1) ("The term 'forward-looking statement' means . . . (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items"). A forward-looking statement qualifies for the PSLRA "safe harbor" and is not actionable if either of the following two conditions is true: (A) the statement is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (B) plaintiffs fail to establish that the statement was "made with actual knowledge . . . that the statement was false or misleading."[3] 15 U.S.C. § 78u-5(c)(1); see In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1068 n.4 (N.D. Cal. 2001) (Armstrong, J.).

Under the first prong, in the context of a motion to dismiss under section 78u-5(c)(1), the court is required to consider the effect of any "statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). Under the second prong, the court must consider whether plaintiffs have stated "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—here, "actual knowledge" that the forward-looking statement was false. 15 U.S.C. § 78u-4(b)(2). Defendants contend that plaintiffs' complaint is deficient in both respects.

7

As other courts and commentators have noted, the disjunctive nature of subsections (A) and (B) arguably permits a corporation or executive to make a deliberately false statement, so long as the statement is accompanied by "meaningful cautionary language." See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2002), cert. denied, 540 U.S. 966 (2003) ("If we allow America West to shield itself from liability based on these statements, any corporation could shield itself from future exposure for past misconduct by making present-tense statements regarding the misconduct and its effects on the corporation"); Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125 (9th Cir. 2004) (applying the two prongs independently); Steven J. Spencer, Note, "Has Congress Learned Its Lesson?  A Plain Meaning Analysis of the Private Securities Litigation Reform Act of 1995," 71 St. John's L. Rev. 99, 121–22 (1997).

The Central District of California considered this aspect of the safe harbor provision and concluded that the most plausible mechanism for providing appropriate restrictions on forward-looking statements within the statutory framework is to interpret the phrase "meaningful cautionary statements" in light of what defendant actually knew at the time the forward-looking statement was made. In re SeeBeyond Techs. Corp. Sec. Litig., 266 F. Supp. 2d 1150 (C.D. Cal. 2003).  Under the SeeBeyond court's formulation, "[i]f the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading." Id. at 1166 n.8.

Following oral argument for this motion, the court requested supplemental briefing on SeeBeyond, which was not addressed previously by either party, and more generally on the proper interpretation of the two alternate methods of establishing protection under the PSLRA safe harbor. Although the parties addressed the question adequately, for the reasons discussed below the court need not consider at this time whether the cautionary statements alleged by defendants satisfy the first prong of the safe harbor.  Instead, the court will consider whether plaintiffs have satisfied the second prong—requiring that the earnings statement was actually known to be false when made. Ninth Circuit law, citing to the safe harbor provisions of section 78u-5(c), makes clear that where

8

the false statement is forward-looking the plaintiff must allege facts that would support actual knowledge. Clorox, 353 F.3d at 1134; In re The Vantive Corp. 283 F.3d at 1085. Since the circuit makes this mandatory the court commences its analysis with this requirement.

Defendants argue that the court should only consider the second prong—failure to plead actual knowledge—if it concludes that the cautionary statements were insufficient. Nothing about the statute or the holding in Clorox, however, suggests that the two prongs must be applied in a particular order.

Under plaintiffs' theory of the case, in order to establish that the revenue projections were knowingly false, plaintiffs must plead the following chain of events with sufficient particularity. First, plaintiffs must establish that the conditions causing the revenue shortfall—the consolidation of the dial-up numbers and the spread of the Sasser worm—existed on or before April 22. Second, plaintiffs must establish that the conditions actually caused usage to decrease on or before April 22. Third, plaintiffs must establish that defendants' internal reports reflected the usage decrease on or before April 22. Fourth, plaintiffs must establish that the defendants responsible for the revenue forecasts had knowledge of the contents of those reports on or before April 22. Finally, plaintiffs must establish that the magnitude of the decrease in usage was sufficient, as of April 22, to render the projections for second-quarter revenue and user growth demonstrably false.

With respect to the first event (existence of the unfavorable condition), plaintiffs note that defendant Denman stated during the June 30 conference call that the "bulk" of the consolidation effort was "implemented throughout the March period." CAC ¶ 32. Read in the light most favorable to plaintiffs, this admission provides direct evidence that one of the conditions causing the revenue shortfall at least began to exist prior to April 22.[4]

With respect to the second event (actual decrease in usage as a result of the unfavorable condition), plaintiffs make no allegations whatsoever as to when and how usage began to decrease. Denman's statement that the consolidation was "implemented throughout the March period," while it might permit an inference that the usage problems began in March, does not rise to the level of "particular facts giving rise to a strong inference" that usage actually decreased. See CAC ¶ 32. Plaintiffs' failure to provide any evidence of actual decline stands in sharp contrast to other

9

"reporting" cases in which courts have found the underlying events to be sufficiently pled. See, e.g., Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1231 (9th Cir. 2004) (contrasting insufficient allegations that defendant "could regularly track its sales data" with sufficient allegations involving "hard numbers" and specific testimony regarding lost sales).

As defendants correctly observe, plaintiff's current complaint is in may respects similar to that rejected by the Ninth Circuit in Lipton v. Pathogenesis Corp., 284 F.3d 1027 (9th Cir. 2002). In Lipton, the Ninth Circuit upheld the district court's dismissal of the complaint because plaintiffs did not "mention a specific IMS document relied on by defendants" and failed to "detail with particularity the content of such data." Id. at 1036. The court concluded that "negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." Id. Here, as well, plaintiffs have failed to allege any specific details as to the contents of the reports.

Plaintiffs have fared better with respect to the third and fourth elements—the existence of daily reports and the fact that executives reviewed them on a daily basis. Plaintiffs have identified two confidential witnesses, both of which were employed by defendants during the relevant period. CAC ¶ 26. Viewing the testimony of these witnesses in the light most favorable to plaintiffs, the witnesses provide direct evidence of the existence of the reports and of their use by defendants.

Plaintiffs' failure to plead facts establishing when and how usage began to decline is even more critical with respect to the final element. Even if usage had declined to some extent by April 22, in order to establish that the revenue and earnings projections were known to be false plaintiffs must establish that the amount of usage decline made the projections untenable. With no data whatsoever as to usage, plaintiffs have fallen far short of meeting their pleading burden.

Plaintiffs also argue that the stock sales which took place following the April 22 earnings call indicate that the earnings projections were knowingly false when made. Insider sales can be probative of defendants' mental state. In re Silicon Graphics, Inc., 183 F.3d at 986. In analyzing insider sales, a court should consider "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." Id.

10

The stock sales at issue in this case are not sufficient to satisfy plaintiff's pleading burden with regard to defendants' mental state. As an initial matter, aside from defendant Russo's sale of 19% of his ownership interest, the amount of the sales—under 10% for defendants McCauley and Lal and 0% for Denman—are lower than the amounts in cases cited by plaintiffs. Cf. Provenz v. Miller, 102 F.3d 1478, 1491 (9th Cir. 1996), cert. denied, 522 U.S. 808 (1997) (finding the sale of 20% of stock holdings gave rise to an inference of scienter); In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 541 (S.D. Ohio 2000) (finding that sales by five defendants of 40%, 40%, 27%, 11%, and 37% of their holdings, respectively, gave rise to an inference of scienter). With respect to defendant Russo, plaintiffs acknowledge that he sold precisely the same number of shares in the previous quarter, before either of the two alleged adverse business conditions arose. Defendant Denman, the CEO and one of the two speakers during the conference call, sold no shares. Finally, the mental state in this case—actual knowledge of falsity—is more stringent than in the cases cited by plaintiffs. Cf. Provenz., 102 F.3d at 1490 (applying a "recklessness" standard); In re SmarTalk Teleservices, Inc., 124 F. Supp. 2d at 539 (same).

Weighing the competing inferences that may be drawn from all of these alleged facts, as this court must do under the PSLRA, the stock sales and other alleged indications of knowledge do not support a "strong inference" that the earnings statement was known to be false when made. Based on plaintiff's current complaint, defendants' forward-looking earnings statements are therefore protected by the PSLRA safe harbor.

II.     Scienter

In cases involving forward-looking statements, the pleading standard for escaping the statutory safe harbor is stricter than the standard for establishing scienter. See, e.g., In re The Vantive Corp. 283 F.3d at 1085. If plaintiffs are able to succeed in pleading with sufficient particularity to satisfy the requirements of the PSLRA safe harbor provision—establishing that defendants actually knew the revenue forecasts were false when made—plaintiffs will also have succeeded in establishing scienter. For the reasons detailed above, plaintiffs have failed to do so in the current complaint.

11

III.     Section 20(a) Claim

Plaintiffs' section 20(a) claim is dependent on their section 10(b) claim, and for the same reason is also dismissed.

IV.     Leave to Amend

Leave to amend should be freely granted unless amendment would be futile. See Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1293 (9th Cir.), cert. denied, 464 U.S. 822 (1983) (futile amendments should not be permitted); In re Silicon Graphics, Inc., 183 F.3d at 991 (denying leave to amend because defects in the pleadings could not be cured by amendment). In the present action, plaintiffs have gone through only a single round of consolidation and correction. Amendment may not be futile in this case, as plaintiffs' complaint already contains many of the factual allegations required to plead securities fraud liability against iPass and the individual defendants. As discussed above, plaintiffs will particularly need to bolster their allegations regarding the amount of usage decline prior to the April 22 press release, and why that decline rendered the revenue and earnings projections demonstrably false. Leave to amend is therefore granted.

CONCLUSION

For the above reasons the court hereby GRANTS defendants' motion to dismiss plaintiffs' Consolidated Amended Complaint without prejudice. Plaintiffs shall file an amended complaint within 30 days of this order.

IT IS SO ORDERED.

Date: February 27, 2006

_____
MARILYN HALL PATEL
United States District Judge
Northern District of California

13

ENDNOTES

1. Unless otherwise noted, background facts are taken from plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws ("CAC").

2. As defendants correctly point out, in determining the significance of stock sales, a court should consider "the proportion of shares actually sold by an insider to the volume of shares he could have sold"; the amount that an investor could have sold includes vested stock options. See In re Silicon Graphics Inc., 183 F.3d 970, 986 (9th Cir. 1999).

3. A third prong of the safe harbor, protecting forward-looking statements that are "immaterial," is not applicable in this case. See 15 U.S.C. § 78u-5(c)(1)(A)(ii).

4. Defendants submitted a request for judicial notice in connection with this motion, asking that the court consider several articles from reputable publications tending to show that the Sasser worm did not exist until April 29 or 30, one week after the statements forming the basis of this lawsuit were made. Although the court is unable to take judicial notice of the articles, particularly in light of plaintiffs' submission of another article contradicting defendants' submissions, the court strongly urges plaintiffs to perform additional fact checking of the date on which the Sasser worm was released prior to filing an amended complaint.