UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re: IPASS, INC. SECURITIES LITIGATION

This Document Relates to:

ALL ACTIONS

No. C 05-00228 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Dismiss**

    Plaintiffs, a consolidated class, brought this action against defendant iPass, Inc. and several of its top executives (the "individual defendants"; collectively with iPass, "defendants") for alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Now before the court is defendants' motion to dismiss plaintiffs' Second Consolidated Amended Complaint ("SAC"). Having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules on the motion as follows.

BACKGROUND[1]

    iPass provides "software-enabled connectivity services for mobile workers"; iPass's connectivity services permit employees to obtain secure access to their employers' internal computer networks from remote locations. SAC ¶ 2. iPass receives revenue, in part, by charging employers a

1

usage fee based on the amount of their employees' use of the service. During the time period relevant to this lawsuit—the first two calendar quarters of 2004—users connected to the iPass service by dialing an access number using a conventional modem, operating over a telephone line. iPass provided a variety of dial-up access numbers in any given geographic area, much like a conventional internet service provider.

The four individual defendants were executives of iPass during the relevant period. Kenneth Denman was Chairman of the Board and Chief Executive Officer. Id. ¶ 16. Donald McCauley was Vice President and Chief Financial Officer. Id. ¶ 17. Anurag Lal was Vice President of Business Development. Id. ¶ 18. Jon Russo was Vice President of Marketing. Id. ¶ 19.

During the first quarter of 2004, from January 1 to March 31, iPass experienced substantial growth in its revenue and user base: iPass added 74,000 new users and had an 8.5% increase in revenue over the previous quarter. Id. ¶¶ 7, 25. On April 22, 2004 iPass issued a press release and participated in a conference call discussing its first quarter results. On the conference call defendants Denman and McCauley spoke positively about the first quarter results and projected nearly identical revenue and user growth for the second quarter.

Following the April 22 press release, certain of the individual defendants sold part of their holdings of iPass stock. Defendant McCauley sold 54,000 shares from his holding of 575,000 shares and vested stock options, or 9.39%.[2] Defendant Lal sold 45,000 shares from his holding of 552,000 shares and vested stock options, or 8.15%. Defendant Russo sold 25,000 shares from his holding of 129,688 shares and vested stock options, or 19.28%. Defendant Denman sold no stock.

Two of the defendants had outstanding loans from iPass during the relevant time period. As of March 31, 2004, Defendant McCauley owed the company approximately $538,240 in principal and interest, id. ¶¶ 17, 43, and Defendant Lal owed iPass approximately $333,150, id. ¶¶ 18, 43. The loans were required to be repaid no later than July 23, 2004. Id. ¶ 43.

iPass did not fare as well as projected during the second quarter. It added only 7,000 new users and experienced a small reduction in revenue compared to the first quarter. When iPass announced its earnings shortfall on June 30, 2004, its stock dropped by 35%. The drop in stock price caused investors in iPass to lose substantial sums of money and prompted the instant lawsuit.

2

At the time, defendants attributed the revenue shortfall to two principal causes. Id. ¶ 32. First, in order to lower costs defendants attempted to reduce the number of separate dial-up numbers that they maintained. Id. As part of the reduction, certain previously operable access numbers were discontinued. According to defendants, users who were accustomed to using the discontinued access numbers became frustrated and ceased attempting to access the iPass service, despite the fact that alternate access numbers were available. Second, defendants claimed to have suffered lost business as a result of internet viruses, particularly the so-called "Sasser" internet worm.

Two core factual allegations underlie the claims in the instant lawsuit. First, plaintiffs claim that the dial-up number consolidation began to have substantial negative effects on defendants' revenue prior to the April 22 press release and conference call, in which defendants announced their projected second quarter results. Id. ¶¶ 26, 28. Second, according to plaintiffs, defendants were aware of the negative effects on revenue through use of a reporting tool which provided defendants with daily information about the revenue generated by users accessing the iPass service. Id.

Based on these two core factual allegations, plaintiffs identified two actionable misrepresentations in the April 22 press release and conference call in their initial Consolidated Amended Complaint ("CAC"). First, plaintiffs claimed that defendants falsely represented that the first quarter results demonstrated "business momentum" (the "business momentum" statement), because defendants already knew that revenue and user growth had begun to decline. Second, plaintiffs claimed that defendants falsely projected that second quarter revenues would be between 7.5% and 8% higher than first quarter revenues, and that GAAP earnings would be $0.08 per share. CAC ¶¶ 25–27 (the "earnings" statement). According to plaintiffs, defendants already knew based on data provided by the reporting tool that the projections were impossible to achieve.

On February 28, 2006, this court issued a Memorandum and Order granting defendants' Motion to Dismiss the CAC ("Court's Order") on two grounds. First, the court found that the "business momentum" statement was puffery and thus not actionable as a matter of law. Court's Order at 7:3–4. Second, the court held that plaintiffs failed to adequately plead facts establishing that defendants' revenue projections were knowingly false when made. Id. at 11:16–18.

3

Plaintiffs were granted leave to amend, and filed the present complaint on March 30, 2006. The SAC focuses only on the allegedly false earnings projections.

Defendants move to dismiss plaintiffs' complaint with prejudice on the grounds that the SAC does not meet the standards set forth in the court's previous order.

LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "[o]rdinarily, a court may look only at the face of the complaint to decide a motion to dismiss." Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir. 2002). Under Rule 12(b)(6), "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied. Lewis v. Telephone Employees Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996) (citation omitted); see also Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") significantly altered pleading requirements in private securities litigation in order to eliminate meritless claims. In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999). The statute requires that a securities fraud complaint must plead both fraud and scienter. See 15 U.S.C. § 78u-4(b)(1)–(2). Plaintiffs must (1) identify each statement alleged to have been misleading, (2) state the reason or reasons why the statement is misleading, and, (3) if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. See 15 U.S.C. § 78u-4(b)(1); In re The Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir. 2002). Allegations are deemed to be held on information and belief, and thus subject to the particularity requirement, unless plaintiffs have personal knowledge of the facts. In re The Vantive Corp., 283 F.3d at 1085, n.3.

A complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has

4

defined the requisite state of mind for a historical statement as "deliberate recklessness, at minimum," and requires plaintiffs to plead "particular facts giving rise to a strong inference" of that mental state. See In re Silicon Graphics, Inc., 183 F.3d at 974. For a forward-looking statement, plaintiff is required to plead facts supporting a strong inference that defendants had "actual knowledge . . . that the statement was false or misleading." See In re The Vantive Corp. 283 F.3d at 1085. "When determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) (emphasis in original).

DISCUSSION

To state a claim under section 10(b), plaintiffs must allege a manipulative or deceptive device such as a material misrepresentation, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation. Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1047 (9th Cir. 2006) (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341–42 (2005)). Defendants argue that plaintiffs' SAC does not cure any of the defects of the CAC identified by the Court's Order, and still fails to allege either a material misrepresentation or the requisite mental state with sufficient particularity.

I.  Material Misrepresentations

Defendants again challenge the legal sufficiency of the alleged misrepresentation on the grounds that the earnings statement was forward-looking and is thus protected by the safe harbor provision of the PSLRA. Under the terms of the safe harbor, according to defendants, plaintiffs' complaint remains deficient in that it still does not sufficiently plead that the earnings statement was knowingly false when made, and because the press release and conference call, as well as iPass's SEC filings, contained cautionary statements describing specific risk factors which could affect the projections.

5

The court previously noted that, under plaintiffs' theory of the case, plaintiffs must allege particular facts sufficient to establish a five-part chain of inferences. Court's Order at 9:8–17. First, plaintiffs must establish that the conditions causing the revenue shortfall existed on or before April 22. Second, plaintiffs must establish that the conditions actually caused usage to decrease on or before April 22. Third, plaintiffs must establish that defendants' internal reports reflected the usage decrease on or before April 22. Fourth, plaintiffs must establish that the defendants responsible for the revenue forecasts had knowledge of the contents of those reports on or before April 22. Finally, plaintiffs must establish that the magnitude of the decrease in usage was sufficient, as of April 22, to render the projections for second-quarter revenue and user growth demonstrably false.

The court previously held that plaintiffs met their pleading burden with respect to the first event (existence of the unfavorable condition), see id. at 9:20–21 and that they "fared better" with respect to the third (the existence of daily reports) and fourth (that executives reviewed the reports on a daily basis) elements. See id. at 10:12. The court dismissed plaintiffs' claim in part, however, because they failed to plead specific facts as to how and when iPass's usage began to decrease and therefore did not meet their burden with respect to the second element (actual decrease in usage as a result of the unfavorable condition) and fifth element (decrease of sufficient magnitude to render the projections demonstrably false). See id. at 10:12, 10:21. The order noted that plaintiffs did not meet their pleading burden, in part, because they "[made] no allegations whatsoever as to when and how usage began to decrease," id. at 9:23 and "failed to allege any specific details as to the contents of the reports." Id. at 10:12.

Plaintiffs argue that the SAC adequately addresses the court's concerns by emphasizing that "company insiders noticed the revenue and earnings shortfall by the start of the Class Period - in 'very late April [2004]'." Plaintiffs' Opposition at 6:26–27 (internal citations omitted). According to plaintiffs, this statement satisfies the second element when coupled with their allegations that "management kept constant track of customer usage." Plaintiffs' Opposition at 7:2–5.

As defendants correctly note in their reply, however, the statement plaintiffs rely on was already included in the CAC. Plaintiffs have merely changed the typeface in their amended complaint. Furthermore, when looked at in context, the statement at issue is not as incriminating as

6

plaintiffs suggest. What Mr. Denman in fact said was that the company began to "see the effects or suspect the effects, of which we couldn't exactly quantify" and that the company therefore "began to do investigations." SAC ¶ 32. These statements do not rise to the level of "particular facts giving rise to a strong inference" that usage actually decreased. See SAC ¶ 32.

Even if the court were to accept plaintiffs' argument that they have met their burden with respect to the second element, their failure to plead facts establishing when and how usage began to decline remains critical with respect to the final element. The Court's Order found that even if usage had declined to some extent by April 22, in order to establish that the revenue and earnings projections were known to be false plaintiffs had to establish that the amount of usage decline made the projections untenable.

The SAC contains no additional facts surrounding the magnitude of the decline. Plaintiffs instead argue that Mr. Denman's statement about the company seeing or suspecting effects in "very late April," SAC ¶¶ 4, 32, 42 coupled with his acknowledgment that the consolidation effort was reversed in mid-May, SAC ¶ 32 permit an inference that "defendants knew the consolidation failure would continue to lower revenues and earnings throughout the quarter." Plaintiffs' Opposition at 8:17–18. The court agrees with defendants that these statements do not permit a plausible inference of actual knowledge that the revenue projections were false as of April 22. They certainly do not permit a strong inference as required by the PSLRA. With still no data whatsoever as to usage, plaintiffs have once more fallen far short of meeting their pleading burden.

As they did in the CAC, plaintiffs point to defendants' stock sales as an alternative means for imputing knowledge to them. Plaintiffs now claim that they need not prove that the amount of the sales was suspicious, and contend that "stock sales made on the heels of a positive company announcement are probative of scienter." Plaintiffs' Opposition at 9:21–22. As noted by defendants, however, the only cases cited as authority for this proposition are pre-PSLRA cases which involved more substance than plaintiffs suggest. See, e.g., Provenz v. Miller, 102 F.3d 1478, 1491 (9th Cir. 1996), cert. denied, 522 U.S. 808 (1997) (finding the timing and amount of the sale of stock holdings gave rise to an inference of scienter); Lilley v. Charren, 936 F. Supp. 708, 718–19 (N.D. Cal. 1996) (Illston, J.) (holding that stock sale allegations should not be stricken because they

7

1  may have some bearing on the litigation).  Since the passage of the PSLRA, the Ninth Circuit has
2  imposed a higher pleading burden and dismissed claims in which either the timing or amount of
3  sales were not suspicious.  See, e.g., Ronconi v. Larkin, 253 F.3d 423 (9th Cir. 2001) (dismissing
4  plaintiffs' complaint despite finding that the timing of certain defendants' sales were suspicious).
5  The test is whether the evidence as a whole leads to a "strong inference" that the statements were
6  knowingly false.  15 U.S.C. § 78u-4(b)(2); see also In re Silicon Graphics, Inc., 183 F.3d at 986
7  (holding that, in analyzing insider sales, a court should consider the amount and timing of sales, as
8  well as wether the sales are consistent with defendant's prior trading history.).

9         The allegations underlying the court's previous findings are not changed, for the most part, in
10  the SAC.  Aside from defendant Russo's sale of 19% of his ownership interest, the amount of the
11  sales—under 10% for defendants McCauley and Lal and 0% for Denman—remains lower than the
12  amounts in cases cited by plaintiffs.  Cf. Provenz, 102 F.3d at 1491 (finding the sale of 20% of stock
13  holdings gave rise to an inference of scienter); In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F.
14  Supp. 2d 527, 542 (S.D. Ohio 2000) (finding that sales by five defendants of 40%, 40%, 27%, 11%,
15  and 37% of their holdings, respectively, gave rise to an inference of scienter).  Furthermore, as noted
16  in the court's previous order, the requisite mental state—actual knowledge of falsity—is more
17  stringent than in the cases cited.  Cf. Provenz, 102 F.3d at 1490 (applying a "recklessness" standard);
   In re SmarTalk Teleservices, Inc., 124 F. Supp. 2d at 539 (same).

18         Defendant Denman, the CEO and one of the two speakers during the conference call, sold no
19  shares.  Plaintiffs' arguments with respect to stock sales therefore do not apply to him.  With respect
20  to Defendant Russo, plaintiffs acknowledge that he sold precisely the same number of shares in the
21  previous quarter, before either of the two alleged adverse business conditions arose.  In light of this
22  concession, Defendant Russo's stock sales also do not raise any suspicion.

23         The SAC contains new allegations with regards to Defendants McCauley and Lal.  Plaintiffs
24  argue that because they had outstanding balances on loans of over $860,000, they "had every
25  incentive in late April, 2004, to withhold the truth about iPass' growth and to sell their iPass stock
26  while the stock price was artificially inflated."  SAC ¶ 6.  These new facts do not address the issues
27  identified in the Court's Order.  If anything, sale to repay a loan is more probative of good faith than

8

bad, as it provides a reason for the sale wholly independent of future business difficulties. Even if the court accepts that the timing of the sales, viewed in light of the defendants' prior trading history, is suspicious, the percentages of stock sold by defendants are too small to cause concern. Viewed in the most favorable light, plaintiffs' new allegations are, at most, "little more than evidence of mere motive and opportunity to commit fraud." In re Silicon Graphics, Inc., 183 F.3d at 988.

Plaintiffs also have added the contention that the amount of stock sold by defendants is significant in light of their overall level of compensation. According to plaintiffs, "the stock sale proceeds of over $540,000 and $640,000 netted [Defendants Mcauley and Lal] roughly twice their annual salaries and bonuses." SAC ¶ 46. The court fails to see how this has any bearing on its previous holding. The defendants' overall level of compensation does not explain why defendants, allegedly armed with the knowledge that iPass stock was soon to plummet, would hold on to over 90% of their shares.

Weighing the competing inferences that may be drawn from all of these alleged facts, as this court must do under the PSLRA, the stock sales and other alleged indications of knowledge do not support a "strong inference" that the earnings statement was known to be false when made. Based on plaintiff's amended complaint, therefore, defendants' forward-looking earnings statements are protected by the PSLRA safe harbor.

II.     Section 20(a) Claim

Plaintiffs' section 20(a) claim is dependent on their section 10(b) claim, and for the same reason is also dismissed.

III.    Leave to Amend

Leave to amend should be freely granted unless amendment would be futile. See Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau, 701 F.2d 1276, 1293 (9th Cir.), cert. denied, 464 U.S. 822 (1983) (futile amendments should not be permitted); In re Silicon Graphics, Inc., 183 F.3d at 991 (denying leave to amend because defects in the pleadings could not be cured by amendment). In the present action, plaintiffs have gone through two rounds of consolidation and

9

correction. Their failure to meet their pleading burden despite the Court's Order having laid out a clear blueprint for doing so suggests that amendment would be futile. Leave to amend is therefore denied.

CONCLUSION

    For the above reasons the court hereby GRANTS defendants' motion to dismiss plaintiffs' Second Consolidated Amended Complaint with prejudice.

    IT IS SO ORDERED.

Date: September 5, 2006

MARILYN HALL PATEL
United States District Judge
Northern District of California

# ENDNOTES

1. Unless otherwise noted, background facts are taken from plaintiffs' Second Consolidated Amended Complaint for Violations of the Federal Securities Laws ("SAC").

2. In determining the significance of stock sales, a court should consider "the proportion of shares actually sold by an insider to the volume of shares he could have sold"; the amount that an investor could have sold includes vested stock options. See In re Silicon Graphics Inc., 183 F.3d 970, 986 (9th Cir. 1999).